IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CARROLL COMPANY <u>et al.</u>          *
                                      *
v.                                    *      Civil Action No. WMN-11-1700
                                      *
THE SHERWIN-WILLIAMS COMPANY          *
                                      *
                                      *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

<u>**MEMORANDUM**</u>

Before the Court is a motion for summary judgment filed by Defendant, The Sherwin-Williams Company, ECF No. 47.  The motion is fully briefed.  Upon a review of the papers and applicable law, the Court determines that (1) no hearing is necessary, Local Rule 105.6, and (2) the motion will be denied.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

As noted in the Court's previous memorandum opinion, ECF No. 15, the parties' dispute relates to the environmental clean-up obligations on a nine-acre tract of land in Havre de Grace, Maryland (the Property).

On December 23, 2005, Plaintiff, Carroll Company (Carroll), and Defendant, The Sherwin-Williams Company (Sherwin-Williams), entered into a Purchase and Sale Agreement (PSA) by which Carroll agreed to purchase the Property.  Plaintiff, Ogden, LLC (Ogden), is an entity created for the purpose of owning the Property.  At the time Sherwin-Williams and Carroll entered into

the PSA, both were aware that the Property had historically been used as an industrial site and that the Maryland Department of the Environment (MDE) had an open file on a remediation work plan submitted by the Property's prior owner, Cello Corporation. In addition, both parties were aware that MDE had advised Sherwin-Williams that participating in Maryland's Voluntary Cleanup Program (VCP) would be one way to address the contamination at the Property "while at the same time offering liability release for both inculpable and responsible parties."[1] ECF No. 47-5 at 4.

On December 20, 2005, Plaintiffs informed Sherwin-Williams by email that they believed that it was Sherwin-Williams' responsibility to ensure that the MDE file was closed.  ECF No. 47-12 at 3.  Moreover, Plaintiffs informed Sherwin-Williams that "if the Voluntary Cleanup Program would give Kyle [Ogden] immunity from liability, we would like for you to apply for that program and conduct the response under that program."[2]  Id.

---

[1] "Responsible person" and "inculpable person" are statutorily defined terms.  "'Responsible person' means any person who . . . is the owner or operator of a . . . site containing a hazardous substance . . . ."  Md. Code. Ann., Envir. § 7-201(u).  An "inculpable person" is a party that "has no prior or current ownership interest in an eligible property at the time of application" and "has not caused or contributed to contamination at the eligible property at the time of application."  Id. at § 7-501(j).

[2] Kyle Ogden is the President and CEO of Carroll Company.

On the day the parties entered into the PSA, in response to Plaintiffs' request that Sherwin-Williams offer some "written indication of [its] intent to enter into the voluntary cleanup program," ECF No. 47-13 at 2, Sherwin-Williams provided Plaintiffs with a letter (the Confirmation Letter) stating: "this letter will confirm that The Sherwin-Williams Company intends to pursue the voluntary cleanup program as proposed by the Maryland Department of the Environment in its letter to The Sherwin-Williams Company dated November 21, 2005." ECF No. 47-15 at 3. The PSA also provided that Plaintiffs would grant Sherwin-Williams access to the Property under the terms of a separate Site Access Agreement (SAA) to be entered into by the parties and delivered at closing. ECF No. 47-9 at 10.

After executing the PSA, but before closing on July 7, 2006, Sherwin-Williams hired Environmental Resources Management (ERM) to prepare and submit VCP applications on behalf of Sherwin-Williams, Carroll and Ogden. On June 27, 2006, ERM emailed Sherwin-Williams to address issues it was encountering in preparing those applications. ECF No. 47-9. Among those concerns, ERM noted that it "will attempt to get unrestricted closure (i.e., applicable for potential residential use), but this may not be realistic or practical for the low level impacts identified on site." Id. at 2. The following day, the email

3

from ERM was forwarded to Plaintiffs' counsel, Fran Phillips.
Id. at 1.

Separate from that email, representatives from ERM and
Sherwin-Williams exchanged emails among themselves on July 27,
2006, concerning the VCP applications and the scope and cost of
possible remediation activities.  ECF No. 47-20 at 2-3.
Sherwin-Williams expressed concern "about the mention of a deed
restriction since this was not negotiated up front and may delay
the closing if we need to stop and negotiate one at this point."
Id. at 3.  In response, ERM noted that

> we may be able to get 'unrestricted' VCP
> closure with minimal activity under the VCP.
> . . . However, it may be easier ( and
> ultimately cheaper) after further assessment
> at the site to get closure as a restricted
> 'commercial/industrial' property.  The
> standards for cleanup for unrestricted use (
> i.e., potential residential) are higher...so
> potential remedial activities could be more
> intensive/expensive if we need to achieve
> unrestricted property use levels.

Id. at 2 (emphasis in original).

On July 6, 2006, the day before closing, Sherwin-Williams
forwarded drafts of the VCP applications to Phillips for the
first time.  Later that day, Phillips returned the applications
to Sherwin-Williams with handwritten changes.  ECF No. 47-22.
One of those changes was to the "Future Property Use" section of
the application.  Sherwin-Williams had initially marked the
future property use as "Tier 3 (Industrial)."  Phillips,

4

however, changed that section to indicate the future property use as "Tier 1 (Residential)."[3]  After submitting the changes, Phillips followed up with another email to Sherwin-Williams stating, at various points:

- "we need [the application] in final as changed before Kyle [Ogden] will sign"
- "We need a VCP application pursuant to the changes I sent you on Ogden in final form for Kyle [Ogden] to sign."
- "Ogden and Carroll need VCP applications ... just need changes I made to be made by ERM and sent to us in final to sign."

ECF No. 47-23 at 3.

After receiving Phillips' changes, Sherwin-Williams forwarded them to ERM and asked "if there is anything SW should be concerned with."  ECF No. 47-24 at 2.  Jeff Flanzenbaum at ERM responded, "I'm not inclined to agree to all of them," and regarding the change to Tier 1, "it may not be a big deal as this just means that Tier 1 is 'our goal' ...which may or may not be achievable."  Id.  In another email to Sherwin-Williams that day, Flanzenbaum wrote:

---

[3] It is undisputed that remediating to a Tier 1 (Residential) level is more demanding than remediating to a Tier 3 (Industrial) level.  Regardless of overall level, it is also possible for a party's obligations to vary based on anticipated deed restrictions.  The draft applications provided to Phillips indicated that the Property's future use would be unrestricted. The application itself denotes unrestricted future uses as "A" and restricted future uses as "B."  Thus, a Tier 1A property would be residential without any deed restrictions and a Tier 3B property would be industrial with deed restrictions.

> I am still not 100% comfortable with Fran's edits to
> the application...particularly the change to "Future
> Use = Residential".  . . . If we try to achieve
> "residential" cleanup criteria, this could get much
> more expensive for S-W due to the necessary sampling
> that the state will demand.  The groundwater is
> impacted, but even "restricted-Residential" will be
> more onerous to achieve than a commercial or
> industrial designation.  We can try, and the
> application does not lock you in to having achieve the
> residential cleanup criteria....but I'm not sure you
> want to default to this from the beginning.

ECF No. 47-25 at 2.  There is no indication in the record that

Flanzenbaum's concerns were ever presented to Plaintiffs and,

despite those concerns, Plaintiffs' changes were incorporated

into the applications that were signed by the parties under

penalty of perjury and submitted to MDE.  See ECF No. 47-26 at

21 & 43.

In addition to indicating the future property use as "Tier

1 (Residential)" without any land use controls (i.e., Tier 1A,

see note 3, supra), the revised applications indicate that the

applicants were seeking a "Certificate of Completion" from MDE.

ECF No. 47-26.  The application explains that

> A "Certificate of Completion" is a notice
> issued by the Department after satisfactory
> completion of an approved response action
> plan stating: the requirements of the
> response action plan have been completed;
> implementation of the response action plan
> has achieved the applicable cleanup
> criteria; the Department may not bring an
> enforcement action at the eligible property;
> the participant is released from further
> liability for remediation of the eligible
> property for any contamination identified in

> the environmental site assessment; and the participant will not be subject to a contribution action instituted by a responsible person.  Please be aware that the "Certificate of Completion" may be conditioned on a specific property use (residential, industrial or commercial) and might include land use controls that include, but not limited to: continual maintenance controls (e.g., cap); use of air monitoring instruments during excavation; a deed restriction on groundwater use beneath the property for any purpose; periodic inspection of controls; and, submittal of periodic inspection reports to the Department.

Id.  The applications also note (1) that Sherwin-Williams is the current owner of the property and a "Responsible Person," (2) that Carroll is the operator of the facility and an "inculpable person," (3) that Ogden is a party "considering purchasing the property" and an "inculpable person," and (4) that the property is zoned "General Industrial," with no pending requests for zoning variances, special exceptions or reclassification.  ECF No. 47-26.  Plaintiffs signed their applications on July 6, 2006, and Sherwin-Williams signed its application on June 29, 2006.  In all cases the parties certified "under penalty of law that the information provided in this application is, to the best of the applicant's knowledge and belief, accurate and complete."  Id.  ERM submitted the applications to MDE after closing and Sherwin-Williams paid all of the application fees.  Id.

Also on the day of closing, the parties executed the SAA which was contemplated by the PSA.  The SAA states in part:

> ... [Sherwin-Williams] desires to obtain access to such Property from Grantors to fulfill [Sherwin-Williams'] obligations under Paragraph 10 of the Purchase Agreement, which may include installing and monitoring of groundwater wells and such other tasks in order to obtain a Certificate of Completion under the Voluntary Cleanup Program administered by the [MDE] as more fully set forth in the VCP Remedial Action Plan as may be amended, and which be attached hereto as Exhibit A and as the scope of work (the "Activities").

ECF No. 53-9 at B.

After closing, Sherwin-Williams and ERM took actions consistent with remediating to a Tier 1A level, including submitting a proposed work plan to MDE.  ECF No. 53-13 (Tier 1A proposed work plan).  In August 2007, MDE responded to the proposed work plan and added several requirements to the remediation effort.  ECF No. 53-15.  Following MDE's response, emails exchanged within ERM and between ERM and Sherwin-Williams suggest that ERM and Sherwin-Williams were concerned about the potential cost and effort required to remediate to a Tier 1A level.  See ECF Nos. 53-16 – 53-19, 54.

In September 2007, ERM modified the work plan and resubmitted it to MDE.  The amended work plan is "based on the assumption that the VCP application will be amended to a restricted residential land use for the site" and reflects the

"future land use" as "industrial."  ECF No. 54-1 at 4.

Plaintiffs were not told of the change.

In September 2008, MDE contacted Plaintiffs and informed
them that the VCP application for the Property was incomplete
because MDE had not received a required Phase II environmental
site assessment (ESA).  ECF No. 54-19.  As a result, Plaintiffs'
application was denied, with the opportunity to resubmit the
application within 60 days.  Id.  The following month, Sherwin-
Williams sent Plaintiffs a proposed ESA.  That document
indicated that the VCP application would be amended to reflect a
future use of "restricted industrial" with "a ground water use
prohibition for potable use."  ECF No. 54-10 at 7.  Through
counsel, Plaintiffs objected to the change. ECF Nos. 54-7 & 54-
9.  Nonetheless, over Plaintiffs' objection, Sherwin-Williams
submitted the ESA and separate revisions to the "Future Property
Use" section of its VCP application in January 2009.  ECF No.
47-34.  Plaintiffs submitted their own applications, but did not
amend the "Future Property Use" section.  ECF No. 47-35.  On
account of that discrepancy, MDE rejected Plaintiffs'
resubmitted applications in April 2009, on the same day it
accepted Sherwin-Williams' resubmitted application into the VCP.
ECF Nos. 47-36, 47-37 & 47-38.

In June 2009, MDE informed Sherwin-Williams that it deemed
Sherwin-Williams' resubmitted application withdrawn because it

had failed to indicate its intent to proceed in the VCP.  ECF
No. 54-20.  Both Plaintiffs and Sherwin-Williams submitted
letters to MDE – Sherwin-Williams indicating its intent to
proceed and Plaintiffs expressing concern that their
applications had been denied.  ECF Nos. 54-14 (Letter from
Sherwin-Williams) & 54-21 (Letter from Plaintiffs).  On June 23,
2009, MDE informed the parties that it would not consider any
application for the Property until the parties resolved their
dispute over the Property's future land use.  ECF No. 54-15.

## II. LEGAL STANDARD

Fed. R. Civ. P. 56 provides that summary judgment is
appropriate if the moving party shows "that there is no genuine
dispute as to any material fact and that the movant is entitled
to judgment as a matter of law."  A dispute of fact is genuine
when "the evidence is such that a reasonable jury could return a
verdict for the nonmoving party."  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 252 (1986).  In making this determination,
all justifiable inferences from the evidence must be drawn in
favor of the non-moving party.  Id. at 255.  The dispute,
however, must also be over a material fact.  That is, one that
might affect the outcome of the suit under the controlling
substantive law; "factual disputes that are irrelevant or
unnecessary" will not be considered.  Id.

In ruling on a motion for summary judgment, the Court's task is not to weigh the evidence, but to determine whether there is an issue appropriate for trial. Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 248). Thus, a plaintiff seeking to defeat summary judgment must proffer "sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

## III. DISCUSSION

Following the Court's ruling on Sherwin-Williams' Motion to Dismiss, see ECF Nos. 15 & 16, Plaintiffs' remaining claims are for intentional misrepresentation (Count III), fraud in the inducement (Count IV), negligent misrepresentation (Count V), and promissory estoppel (Count VI).

### A. Fraud and Fraud in the Inducement[4]

To establish a claim for fraud, a plaintiff must prove:

> (1) that the defendant made a false
> representation to the plaintiff, (2) that
> its falsity was either known to the
> defendant or that the representation was
> made with reckless indifference as to its
> truth, (3) that the misrepresentation was
> made for the purpose of defrauding the

---

[4] As noted in the Court's opinion on Sherwin-Williams' Motion to Dismiss, ECF No. 15 at 16 n.8, the parties are in agreement that the elements for both of these causes of action are the same. Thus, the Court will again conduct a singular analysis of Count III and Count IV.

> plaintiff, (4) that the plaintiff relied on
> the misrepresentation and had the right to
> rely on it, and (5) that the plaintiff
> suffered compensable injury resulting from
> the misrepresentation.

VF Corp. v. Wrexham Aviation Corp., 715 A.2d 188, 192-93 (Md.

1998).  These elements must be established by clear and

convincing evidence.  Id.; see also Gross v. Sussex Inc., 630

A.2d 1156, 1151 (Md. 1993).

### 1. A Reasonable Jury Could Find Sherwin-Williams Made False Representations

Sherwin-Williams claims that it did not make any actionable

false representations to Plaintiff for two reasons.  First,

Sherwin-Williams argues that none of its alleged representations

were definite or specific.  Second, it argues that the alleged

false representations were simply statements of prediction or

expectation.

False representations must be "definite."  Fowler v.

Benton, 185 A.2d 344, 349 (Md. 1962).  "[V]ague, general, or

indefinite" statements are generally not actionable.  Id.  In

addition, "the general rule is that predictions or 'statements

which are merely promissory in nature and expressions as to what

will happen in the future are not actionable as fraud.'"  Miller

v. Fairchild Indus., Inc., 629 A.2d 1293, 1302 (Md. Ct. Spec.

App. 1993) (quoting Finch v. Hughes Aircraft Co., 469 A.2d 867

(Md. Ct. Spec. App. 1984)).  This general rule does not apply,

however, when such statements are made without an intent to perform. Id. The Court of Appeals of Maryland has also noted that what constitutes a misrepresentation is frequently difficult to determine and "depends upon the particular circumstances and conditions in each individual case." Fowler, 185 A.2d at 349.

On the issue of definiteness, there is sufficient evidence in the record from which a jury could find that Sherwin-Williams made a definite representation about its intent to complete remediation activities at the Property. Indeed, the real issue in this case is not the definiteness of the representation, but its meaning. As the Court previously noted, the meaning of the word "pursue" in the Confirmation Letter is disputed by the parties. ECF No. 15 at 18. That is obviously still the case. Compare Def. Mem. at 21-22, with Opp'n at 31-32. The Court now concludes that the competing interpretations of the word "pursue" are sufficient to create a question of fact appropriate for a jury on this element because there is evidence in the record from which a jury could reasonably find support for either of the parties' interpretations.

Sherwin-Williams also suggests that "the non-binding nature of the VCP Applications is dispositive of whether a representation in the VCP applications was sufficiently definite as a matter of law to support a fraud claim." Def. Mem. at 24.

The Court finds that this issue was adequately addressed in its
previous opinion.  There, the Court held that Sherwin-Williams'

> assumption is flawed . . . because while it
> is true that the Tier 1 Applications do not
> bind Defendant to participate in the VCP and
> complete the necessary requirements to
> obtain a Certificate of Completion, the
> submitted applications, which were signed
> under penalty of perjury by an authorized
> Sherwin-Williams representative, themselves
> contain statements that represent Defendant
> to be a "Responsible Person" seeking a
> Certificate of Completion, conditioned on a
> Tier 1A future property use, which will be
> issued upon satisfactory completion of an
> approved response action plan, which the
> application indicates as "to be provided."

ECF No. 15 at 19-20.

Finally, Sherwin-Williams argues that any alleged
representation that it would remediate to a Tier 1A level was
not definite because it was made just before closing and months
after the parties entered the PSA.  See Def. Mem. at 21.   The
Court finds that the "particular circumstances and conditions"
of this case, where closing was intentionally separated from
entering the PSA by several months, would allow a jury to find a
definite representation.  Fowler, 185 A.2d at 349.

As to Sherwin-Williams' claim that the alleged
representations were simply prediction or expectation, this too
is inadequate to support granting summary judgment.  Sherwin-
Williams suggests that achieving Tier 1A status would depend on
several factors such as:

14

> (i) whether the MDE would accept the
> application; (ii) what specific testing the
> MDE would require before it accepted the VCP
> Application; (iii) what specific clean up
> MDE would require before it would issue a
> Tier 1A Certificate of Completion . . . ;
> and (iv) whether Sherwin-Williams would deem
> the testing or clean up required by the MDE
> before it would issue a Tier 1A COC) to be
> reasonable and practical.

Def Mem. at 25.  Thus, Sherwin-Williams argues that the

representations in the VCP application were "merely predictive

or an expectation" because "Sherwin-Williams was not in

'exclusive control' of what would be required to achieve the

Tier 1A" status.  Id.  To the extent that "exclusive control" is

a relevant factor in this determination, the record is mixed as

to whether most of Sherwin-Williams' posited contingencies were

truly obstacles to achieving Tier 1A status.  In particular,

there is evidence that Sherwin-Williams and MDE were

communicating about the requirements for remediating to a Tier

1A level.  See ECF Nos. 53-12 (August 2006 letter from MDE) &

53-15 (August 2007 email regarding workplan).  Indeed, the

record could support a reasonable conclusion that the only

obstacle to remediating to Tier 1A was Sherwin-Williams'

willingness to make the effort – financially or otherwise – to

complete the activities required by MDE.  See ECF Nos. 53-16 –

53-19, 54.  This, obviously, is a factor within Sherwin-

Williams' exclusive control; one that goes to the crux of the parties' dispute.

### 2. A Reasonable Jury Could Find That Sherwin-Williams Made False Representations Knowingly

The type of alleged false representation at issue in Plaintiffs' intentional misrepresentation and fraudulent inducement claims is one of "an existing intention to perform where such intent is in fact nonexistent."  ECF No. 15 at 16; Tufts v. Poore, 147 A.2d 717, 723 (Md. 1959).  As Plaintiffs note, evidence which indicates that Sherwin-Williams lacked an intention to perform at the time it made the alleged representations, also serves to establish the second element of their fraud claim – Sherwin-Williams' knowledge that its statements were false.  Opp'n at 38-39.

Sherwin-Williams correctly notes that "'fraudulent pre-existing intent not to perform a promise cannot be inferred from the failure to perform the promise alone.'" Def. Mem. at 26 (quoting Tufts, 147 A.2d at 722).  Here, however, there is additional evidence in the record which suggests that Sherwin-Williams lacked any intent to perform consistent with the alleged representations.  Most significant are minutes from one of its internal meetings in February 2006, which note that "Kyle[] [Ogden's] expectation is that SW is committed to entering the facility, however SW has documentation stating that

16

they have agreed to pursue the entry, but there was no commitment." Def. Mem., Ex. 65 (Filed Under Seal).   The testimony of Sherwin-Williams' representatives also indicates that it viewed its obligation as simply entering (i.e., applying for, not completing) the VCP. See ECF No. 49-1 (Legenza Dep.) at 80:21-81:9, 82:7-14; ECF No. 49-2 (Kuntz Dep.) at 89:22-91:1. Based on this evidence, if the jury finds that Sherwin-Williams represented to Plaintiffs that it would complete the VCP, it could reasonably conclude that Sherwin-Williams did not actually intend to do so and thus that the misrepresentation was made knowingly.

### 3. **Sherwin-Williams' Intent and Plaintiffs' Justifiable Reliance Cannot Be Decided on This Record at Summary Judgment**

Sherwin-Williams argues that Plaintiffs cannot establish that it made the alleged misrepresentations for the purpose of defrauding Plaintiffs and, even if it could, Plaintiffs' reliance on its representations was not reasonable.  Def. Mem. at 28-33.  Both of these issues are most appropriately resolved by a jury.

"The Fourth Circuit has cautioned that cases which turn on a finding of intent are not appropriate for summary judgment since resolution of that issue depends on the credibility of witnesses as determined by the trier of fact after observation of the witnesses' demeanor during direct and cross-examination"

Tenax Corp. v. Tensar Corp., 743 F. Supp. 1204, 1208 (D. Md.
1990).  That appears to be sound guidance in a case such as this
one where there is evidence which suggests that the alleged
misrepresentations were made for the purpose of getting
Plaintiffs to close on a multi-million dollar purchase of the
Property.

The issue of a plaintiff's reasonable reliance is also
generally understood to be one that is best left to the jury.
See 200 North Gilmor, LLC v. Capital One, N.A., 863 F. Supp. 2d
480, 491 (D. Md. 2012).  Nonetheless, Sherwin-Williams offers
numerous arguments that Plaintiffs' reliance was unreasonable as
a matter of law, none of which are availing.  First, Sherwin-
Williams argues that any reliance by Plaintiffs was unreasonable
because the parties here were sophisticated and represented by
counsel.  Sherwin-Williams relies on Rubin Squared, Inc. v.
Cambrex Corp., No. 03 CIV. 1013 (PAC), 2007 WL 2428485, at *5-6
(S.D.N.Y. Aug. 24, 2007).  There, the court held that the
plaintiff could not reasonably rely on "Defendant's alleged pre-
contractual oral representations."  Id. at 5 (emphasis added).
Rubin Squared is inapplicable here because not only were the
alleged misrepresentations not pre-contractual, they were not
oral either.

Second, Sherwin-Williams argues that Plaintiffs' reliance
was "per se unreasonable" because the "extra-contractual

representation contradicts terms of the written contract." Def.
Mem. at 31. Specifically, Sherwin-Williams points to paragraphs
in the PSA whereby Plaintiffs disclaimed both past and future
reliance on representations by Sherwin-Williams. See ECF No.
47-9 at ¶ 10a (Carroll's "determination to purchase the property
will be based upon its own judgment and it has not relied on any
representation of Seller, its employees, agents or contractors,
except as expressly provided herein") & 10b ("Purchaser
represents and warrants to Seller that Purchaser has not relied,
and will not rely, upon any document, information,
representation or statement (other than those expressly made in
this agreement) made or provided by Seller, its agents or
employees, or upon the failure to make or provide any document,
information, representation or statement by Seller, its agents
or employees"). Sherwin-Williams asks that this Court construe
these provisions as "specific disclaimer[s] of reliance" which
render Plaintiffs' reliance on the alleged misrepresentations
unreasonable. Def. Mem. at 32. It argues that they should be
so construed because they appear under a heading that includes
the terms "property condition" and "environmental matters." Id.
In another case this contract language might be conclusive, but
the context in which the disclaimers appear is more mixed than
Sherwin-Williams allows. In particular, the very same paragraph
where the disclaimers are found indicates that the parties would

19

enter into the SAA at closing several months later, ECF No. 47-9 at ¶ 10g, and the SAA itself contains some of the alleged misrepresentations at issue.  See ECF No. 53-9 at 1, quoted supra at 8.  While this language in the PSA may be relevant to the question of Plaintiffs' reasonable reliance, it does not render Plaintiffs' reliance unreasonable as a matter of law.

Finally, Sherwin-Williams recites a litany of facts such as Plaintiffs' receipt of the forwarded email from ERM indicating that achieving unrestricted closure may not be "realistic or practical," their failure to seek an amendment of the contract, and their failure to submit a "Property Condition Notice,"[5] all of which it asserts render Plaintiffs' claim of reliance unreasonable.  Sherwin-Williams will be free to present these facts to the jury, but they do not suggest that summary judgment is appropriate.

### 4. Plaintiffs Have Presented a Triable Issue on Damages

Sherwin-Williams argues that Plaintiffs have "fail[ed] to prove" the damages element of their fraud claim.  Def. Mem. at

---

[5] Under Paragraph 3C of the PSA, see ECF No. 47-9 at 4, a "Property Condition Notice" (PCN) is a writing by which Plaintiffs would identify for Sherwin-Williams any defects in the Property to which Plaintiffs objected. Id.  Plaintiffs' submission of a PCN would permit, but not obligate, Sherwin-Williams to take corrective action and, if such action was not undertaken by Sherwin-Williams, Plaintiffs had the option of terminating the PSA.  If Plaintiffs did not submit a PCN, they would "be conclusively deemed to have waived all objections to the condition of the Property." Id.

34.  According to Sherwin-Williams, they are not entitled to the benefit-of-the-bargain damages they seek because there was no bargain between the parties based on this Court's dismissal of Plaintiffs' breach of contract claim.  Id. (citing Goldstein v. Miles, 859 A.2d 313 (Md. Ct. Spec. App. 2004)).  The bargain between the parties, however, need not include the alleged misrepresentation.  If that were the case, claims for fraudulent inducement, intentional misrepresentation, and negligent misrepresentation would always be duplicative of actions for breach of contract.  Rather, all that is required for Plaintiff to recover benefit-of-the-bargain damages is (1) that a "bargain" (i.e., "almost always . . . an 'enforceable contract'") exist between the parties, and (2) that "the deal authorized by the contract was consummated."  Goldstein, 859 A.2d at 428-29; see also Hinkle v. Rockville Motor Co., 278 A.2d 42 (Md. 1971) ("evidence in regard to the cost of necessary repairs [to vehicle] demonstrated the existence of damages and provided an adequate measure upon which they could be predicated" in fraud claim based on extra-contractual representations).  These requirements are unquestionably met here and thus, if the jury finds that the other elements of Plaintiffs' cause of action is satisfied, it may consider awarding damages under a benefit-of-the-bargain theory.

21

**B. Negligent Misrepresentation**

To prove negligent misrepresentation, a plaintiff must establish:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;(2) the defendant intends that his statement will be acted upon by the plaintiff;(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;(4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Martens Chevrolet, Inc. v. Seney, 439 A.2d 534, 539 (Md. 1982). Unlike intentional misrepresentation, these elements need only be proven by a preponderance of the evidence.  See Weisman v. Connors, 540 A.2d 783, 793 (Md. 1988).

Sherwin-Williams argues that it did not owe a duty of care to Plaintiffs.  As Sherwin-Williams notes, it is true that "the mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort." Def. Mem. at 36 (quoting Flow Indus., Inc. v. Fields Constr. Co., 683 F. Supp. 527, 530 (D. Md. 1988)).  Plaintiffs, however, do not appear to argue that Sherwin-Williams negligently breached the contract in this case.  Opp'n at 45.  Rather, Plaintiffs argue, in accordance with well-established law, that

Sherwin-Williams' duty not to negligently misrepresent its intentions, stems from the intimate nexus created by the parties' contractual privity and the circumstances surrounding the creation of that privity. Id. (citing Griesi v. Atl. Gen. Hosp. Corp., 756 A.2d 548 (Md. 2000)); Weisman, 540 A.2d at 794. That the parties are sophisticated commercial entities is not dispositive of this issue.  See Dierker v. Eagle Nat. Bank, 888 F. Supp. 2d 645, 655-56 (D. Md. 2012) (Quarles, J.) (arms-length negotiations between commercial entities may give rise to the required "intimate nexus" where they invoke "considerations of personal trust and reliance") (quoting Sagent Tech., Inc. v. Micros Sys., Inc., 276 F. Supp. 2d 464, 471-72 (D. Md. 2003)). In Dierker, the Court noted that in a case such as this one, an "intimate nexus" upon which a duty of care is predicated may be found (1) based on the length and complexity of the parties' negotiations, (2) when the parties have contemplated a long-term relationship, (3) when one party had exclusive control over information necessary for the other to understand the situation, or (4) when the defendant's promises were an inducement to the plaintiff and provided the defendant with a business advantage when the plaintiff conformed to them.  888 F. Supp. 2d at 655-56.  The Court determines that there is sufficient evidence in the record from which a reasonable jury could find that Sherwin-

Williams owed Plaintiffs a duty of care based on several, if not all, of these factors.

Sherwin-Williams also argues that Plaintiffs' claim of negligent misrepresentation is not viable in light of this Court's opinion in 200 North Gilmor (Hollander, J.). There, the Court held that, "a promise made with the present intention not to perform is perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation." 863 F. Supp. 2d at 493. Sherwin-Williams reads too much into 200 North Gilmor, and too little into Plaintiffs' argument. In 200 North Gilmor, the Court ruled on the defendant's motion to dismiss and its holding was premised on the plaintiff's allegation in its complaint that the defendant "at the time of the representation . . . had an existing intention not to perform." Id. (emphasis in original) (internal quotations and citations omitted). Here, Sherwin-Williams argues that "Plaintiffs continue to maintain that Sherwin-Williams had no intention to remediate the property to Tier 1A or pursue the VCP application process at the time the parties entered into the transaction." Def. Mem. at 39. That is certainly one reading of Plaintiffs' position, but it is not the only one. Plaintiffs have also elicited facts – some of which are undisputed - that they were never informed that Sherwin-Williams and ERM considered remediating to Tier 1A to be

24

simply a goal, that Sherwin-Williams did not know at the time it submitted the VCP applications what would be required to reach Tier 1A, and that it did pursue efforts to remediate to Tier 1A until it found out how much that work would cost.  See e.g., Opp'n at 22-28 & 47.  Each of these belies Sherwin-Williams' assertion that Plaintiffs' only argument sounds in intentional misrepresentation.

Finally, Sherwin-Williams argues that it did not make any misrepresentations to Plaintiffs, that none of the alleged misrepresentations were false, and that Plaintiffs were contributorily negligent for relying on the alleged misrepresentations and preventing Sherwin-Williams from completing the VCP to a Tier 3 level.  These are all highly contested questions of fact that do not support granting summary judgment. The motion will therefore be denied as to Count IV.

### C. Promissory Estoppel

Defendant has also moved for summary judgment on Plaintiffs' claim for promissory estoppel/detrimental reliance. To establish a claim for promissory estoppel, a Plaintiff must prove,

> (1) a clear and definite promise;
> (2) where the promisor has a reasonable
> expectation that the offer will induce
> action or forbearance on the part of the
> promisee;
> (3) which does induce actual and reasonable
> action or forbearance by the promisee; and

25

> (4) causes a detriment which can only be
> avoided by the enforcement of the promise.

Pavel Enters., Inc. v. A.S. Johnson Co., Inc., 674 A.2d 521, 532

(Md. 1996).  Sherwin-Williams applies the same arguments it

offered on Plaintiffs' claims for intentional misrepresentation

and fraudulent inducement to the first three elements of this

claim.  Def. Mem. at 41-42.  For the reasons discussed above,

the Court finds that these arguments do not support granting

summary judgment on Plaintiffs' claim for promissory estoppel.

    The fourth element is different, however, because the

Court, not a jury, must conclude that binding the promisor is

necessary to prevent injustice.  Pavel Enters., 674 A.2d at 533-

34.  To satisfy this element, the plaintiff must also have

"clean hands."  Id.  Sherwin-Williams argues that no injustice

resulted here because it agreed to and did, in fact, submit

applications to the VCP in addition to taking steps to achieve

inculpable person status for Plaintiffs.  Def. Mem. at 42.

Moreover, Sherwin-Williams argues that "all parties would have

gained the protection of a Tier 3 COC but for Plaintiffs'

refusal to permit their applications to the MDE to be revised."[6]

---

[6] To the extent that Sherwin-Williams believes that this refusal
by Plaintiffs indicates that they are before the Court with
"unclean hands," the Court disagrees.  The unclean hands
doctrine "protects the integrity of the court and the judicial
process by denying relief to those persons whose very presence
before a court is the result of some fraud or inequity."  Hicks
v. Gilbert, 762 A.2d 986, 990 (Md. Ct. Spec. App. 2000)

The Court finds that none of these factors warrants granting summary judgment.  In <u>Sedghi v. PatchLink Corp.</u>, the Fourth Circuit held that the plaintiff's receipt of benefits ancillary to the promise at issue was not dispositive of the plaintiff's claim for promissory estoppel when it appeared that the defendant's "promise nevertheless induced actual and reasonable action or forbearance by [the plaintiff]."  440 Fed. App'x. 165, 169 (4th Cir. 2011).  Following this guidance, the Court will not grant summary judgment based on the fourth element in light of the significant evidence in the record that could satisfy the first three elements.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be denied.  A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: April 2, 2013

---

(internal quotation marks omitted).  Thus, "'[i]t is only when the plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this conduct.'"   <u>Adams v. Manown</u>, 615 A.2d 611, 617 (Md. 1992) (quoting D. Dobbs, <u>Remedies</u> § 2.4, at 46 (1973)).  That is not the case here because even if Plaintiffs had permitted Sherwin-Williams to remediate to a Tier 3 level, they would still have had a colorable claim for promissory estoppel on account of its failure to meet the alleged promise of remediating to Tier 1.